## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

TIMOTHY HAND, JR.,

    Plaintiff,

    v.

MARY ALLEN,
BRENDA LOWERY,
CECIL COUNTY CORRECTIONAL
    FACILITY,

    Defendants.

Civil Action No.: JKB-20-3119

### MEMORANDUM OPINION

Pending in this civil rights case is defendants' motion to dismiss or for summary judgment. ECF No. 14. Although plaintiff Timothy Hand, Jr. was provided notice of his right to file an opposition to the pending motion and of the consequences of failing to do so, he has filed nothing further in this case. ECF No. 15 (Notice). No hearing is required. *See* Local Rule 105.6 (D. Md. 2021). For the reasons that follow, defendants' motion shall be granted.

### I.    Background

At all times relevant to this complaint plaintiff was incarcerated at the Cecil County Correctional Facility.[1] He alleges that while he was housed in the gym with other COVID-19 positive inmates, Sergeant Brenda Lowery sprayed mace in the vicinity of plaintiff and other COVID-19 positive inmates despite a prohibition from deploying mace in that area.

Plaintiff explains that he arrived at the Cecil County facility on November 14, 2020. ECF No. 4 at 3. He states that he was tested for the COVID virus and Sgt. Wright placed him "in a cell

---

[1]    Plaintiff was transferred to Caroline County's detention center while this case was pending.

that 2 inmates who had COVID-19"[2] were located. *Id.* Plaintiff recalls being told by Sgt. Wright that he was not allowed to use the cleaning supplies to clean the cell. *Id.* Sgt. Wright is not a defendant in this case.

On November 15, 2020, plaintiff states that Sgt. Spade, who is also not a defendant here, put another inmate, Randy Smith, into the cell with plaintiff. ECF No. 4 at 3. According to plaintiff, he was not supposed to have a cellmate. *Id.*

The following day, plaintiff claims that Sgt. Spade put him into a bullpen with eleven other inmates. ECF No. 4 at 3. Plaintiff states that he was not sick until he was brought to the Cecil County facility and claims he received a negative COVID test result on November 14, 2020 and that five-days later he tested positive. *Id.*

After receiving a positive test result, plaintiff was moved to the gym where other COVID positive inmates were housed. *Id.* Plaintiff claims that on November 25, 2020, Sgt. Lowery maced inmate Bryan Davis in the dayroom "for no reason" and then came into the gym "using Officer Mackey as a shield" and maced "the whole gym." *Id.* At the time, plaintiff states he was standing by himself eating. *Id.* He claims someone told him that he deserved to be maced because he told Davis to "just stop and get away from . . . Sgt. Lowery." *Id.* Plaintiff maintains that Sgt. Lowery knew the inmates in the gym were sick and that she was not allowed to use mace in that area because it would cause "the COVID to act up." *Id.*

Defendants explain that plaintiff's history at the Cecil County Detention Center includes at least twelve prior commitments. ECF No. 14-3 at 2 (listing 12 prior bookings). On September 17, 2020, plaintiff was committed to Cecil County Detention Center but was transferred to Caroline County due to his concerns for his safety on September 25, 2020. ECF No. 14-5 at 2;

---

[2]     It is unclear whether Sgt. Wright put plaintiff into a cell with two other inmates who were suffering from COVID-19, or the cell had previously housed inmates who were COVID-19 positive.

ECF 14-7 at 3.  On October 7, 2020, plaintiff was convicted in a Cecil County court on charges related to driving without a license, sentenced to 60 days, and committed to the Cecil County Detention Center.  ECF No. 14-8 at 2.  Plaintiff was convicted on charges related to possession of a controlled dangerous substance in November 2020.  ECF No. 14-6 at 6-7 (Commitment record).

Defendants explain that on October 16, 2020, the Cecil County Detention Center began using "the Yellow Tier housing unit to house male inmates who had tested positive for COVID-19."  ECF No. 14-10 at 3, ¶ 6.  Warden Allen explains that all inmates housed in the Yellow Tier housing unit, "whether in the cellblock or in the gym, had tested positive for COVID-19."  *Id.* Warden Allen further explains that she never issued any prohibition against the use of "OC Spray in the Yellow Tier or any other housing unit" because such a prohibition would endanger both staff and inmates.  *Id.* at ¶ 7.

The incident involving Sgt. Lowery occurred on October 23, 2020.  ECF No. 14-16 at 2 (incident report); ECF No. 14-17 at 2, ¶ 3 (Affidavit of Brenda Lowery).  Sgt. Lowery states that at the time of the incident she was the supervisor for the 1600 to 2400 shift.  ECF No. 14-17 at 2, ¶ 3.  She received a phone call from Lt. Jolly at approximately 2310 hours, directing her to move inmates David McGonigle, Jorge Perez, and James Yorkity from the Yellow Tier housing unit to the Yellow Tier gym as quickly as possible and to notify him when the move was complete.  *Id.*

Deputy Tyvonne Mackey, who was assigned to the Yellow Tier housing unit, ordered all inmates to lock down, but when Sgt. Lowery arrived she saw that the television was still on and that the inmates were not returning to their cells.  ECF No. 14-17 at 2, ¶ 4.  Sgt. Lowery issued an order to the inmates to lock into their cells.  *Id.*  Inmate Brian Davis chose instead to walk over to a kiosk and begin placing a commissary order rather than return to his cell.  *Id.* at 3, ¶ 5.  Sgt. Lowery ordered Davis to return to his cell, but Davis ignored the order, continued placing his

commissary order, and began shouting at Sgt. Lowery. *Id.* When Sgt. Lowery again ordered Davis to lock in, he became aggressive, moving very close to Sgt. Lowery. *Id.* When Sgt. Lowery told Davis to back up, Davis claimed that Sgt. Lowery was "in his space." *Id.*

In response to Davis's recalcitrance, Sgt. Lowery attempted to deploy a short burst of OC Spray (referred to as "mace" by plaintiff) into Davis's face, but the spray did not dispense, and Davis ran towards the gym where plaintiff was located. ECF No. 14-17 at 3, ¶ 6. Sgt. Lowery called for assistance on her radio and directed the other officers to lock the inmates into their cells. *Id.* Sgt. Lowery then went over to the gym and ordered Davis to come out but he refused. *Id.*

Plaintiff and another inmate, Austin Hitchcock, were standing near Davis telling him he should cooperate, but Davis continued to yell and refuse to comply with orders. ECF No. 14-17 at 3, ¶ 7. In her assessment of the situation, Sgt. Lowery believed the situation was "becoming increasingly dangerous as the inmates housed in the gym were not confined to cells; they were merely assigned bunks." *Id.* Deputy First Class Zachary Miller provided Sgt. Lowery with his OC canister. *Id.* at ¶ 8. Sgt. Lowery told Deputies Miller and Mackey that Davis needed to be restrained and removed from the gym but when they attempted to restrain Davis, Davis began to resist and continued shouting. *Id.* It was at this time that Sgt. Lowery deployed a "short, less than one second burst of OC Spray into Davis's face." *Id.* Because plaintiff and Hitchcock were still standing nearby, the spray contacted them as well. *Id.* at ¶ 9. "All inmates in the gym were then ordered to their bunks." *Id.*

Despite their efforts to gain control over Davis, he continued to resist. ECF No. 14-17 at 3-4, ¶ 10. Once Davis was handcuffed, he was removed from the gym and taken to the Medical Unit. *Id.* at 4, ¶ 10. Plaintiff and Hitchcock were "briefly handcuffed, seen by medical staff, and cleared." *Id.* at ¶ 11. The remaining inmates in the gym were "disinfected and issued clean

4

clothing" and the gym was cleaned. *Id.* As an additional mitigation measure, the gym door was propped open so that air could flow in. *Id.*

Plaintiff and Hitchcock "were ordered to sit in the chairs in the dayroom, just outside the gym, as both claimed they were still having trouble breathing." ECF No. 14-17 at 4, ¶ 12. Both continued to get out of the chairs; Hitchcock kept talking to inmates who were locked into nearby cells and plaintiff was pacing the floor in the dayroom. *Id.* Both plaintiff and Hitchcock were shouting profanities at Sgt. Lowery and other officers, agitating inmates who were locked in their cells. *Id.* at ¶ 13.

During the relevant time frame, plaintiff filed two grievances on October 28, 2020 regarding his inability to use the phone during recreational time and loss of his property during his transfer from Caroline to Cecil County. ECF No. 14-14 at 4-5. Plaintiff later withdrew both grievances. *Id.*

## II.   Standard of Review

Defendants rely on exhibits attached to their Motion. Because the court will consider defendants' exhibits, the court must convert the motion to dismiss to a motion for summary judgment. "[N]o formal notice of conversion by the district court is required in cases where it is apparent that what is nominally a Rule 12(b)(6) motion to dismiss is subject to conversion to a summary judgment motion—for example, where the motion is captioned in the alternative as a motion for summary judgment and affidavits are attached to the motion." *Carter v. Balt. Cty., Maryland,* 39 F. App'x 930, 933 (4th Cir. 2002) (per curiam).

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med.*

*Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). Importantly, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The court maintains an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting Fed. R. Civ. P. 56(e)). A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 249-50.

**III.    Analysis**

Defendants assert that the complaint is subject to dismissal because plaintiff did not exhaust administrative remedies as required by the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e. Additionally, they assert they are entitled to qualified immunity and that the force used by Sgt. Lowery did not amount to a constitutional violation.

**A.    Exhaustion of Administrative Remedies**

The PLRA provides in pertinent part that:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

6

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see Chase v. Peay*, 286 F.Supp.2d 523, 528 (D. Md. 2003), *aff'd*, 98 Fed. Appx. 253 (4th Cir. 2004).

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner. Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by defendants. *See Jones v. Bock*, 549 U.S. 199, 215-216 (2007); *Custis v. Davis*, 851 F.3d 358, 361 (4th Cir. 2017). Nevertheless, a claim that has not been exhausted may not be considered by this court. *See Bock*, 549 U.S. at 220. In other words, exhaustion is mandatory. *Ross v. Blake*, 578 U.S. 632, 639 (2016). Therefore, a court ordinarily may not excuse a failure to exhaust. *Ross*, 578 U.S. at 639 (citing *Miller v. French*, 530 U.S. 327, 337 (2000) (explaining that "[t]he mandatory 'shall'. . . normally creates an obligation impervious to judicial discretion")).

Ordinarily, an inmate must follow the required procedural steps in order to exhaust his administrative remedies. *Moore v. Bennette*, 517 F.3d at 725, 729; *see also Langford v. Couch*, 50 F.Supp. 2d 544, 548 (E.D. Va. 1999) ("[T]he . . . PLRA amendment made clear that exhaustion is now mandatory."). Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006). This requirement is one of "proper exhaustion of administrative remedies,

which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency

addresses the issues on the merits).'" *Woodford* 548 U.S. at 93 (quoting *Pozo v. McCaughtry*, 286

F.3d 1022, 1024 (7th Cir. 2002)) (emphasis in original). But the court is "obligated to ensure that

any defects in [administrative] exhaustion were not procured from the action or inaction of prison

officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see also Kaba v.*

*Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).

Exhausting administrative remedies after a complaint is filed will not save a case from

dismissal for failure to exhaust administrative remedies. *See Neal v. Goord*, 267 F.3d 116, 121-

22 (2d Cir. 2001) (overruled on other grounds). In *Freeman v. Francis*, 196 F.3d 641, 645 (6th

Cir. 1999), the court stated: "The plain language of the statute [§ 1997e(a)] makes exhaustion a

precondition to filing an action in federal Court. . . . The prisoner, therefore, may not exhaust

administrative remedies during the pendency of the federal suit." *See Kitchen v. Ickes*, Civ. No.

DKC-14-2022, 2015 WL 4378159, at *8 (D. Md. July 14, 2015); *see also Blackburn v. S. Carolina*,

No. C A 006-2011-PMD-BM, 2009 WL 632542, at *1 (D.S.C. Mar. 10, 2009) *aff'd*, 404 F. App'x

810 (4th Cir. 2010); *Kaufman v. Baynard*, CIV. A. 1:10-0071, 2012 WL 844480 (S.D.W. Va. Feb.

3, 2012) *report and recommendation adopted*, CIV. A. 1:10-0071, 2012 WL 844408 (S.D.W. Va.

Mar. 12, 2012); *Miller v. McConneha, et al.*, JKB-15-1349, 2015 WL 6727547, at *3–4 (D. Md.

November 11, 2015). State statutes of limitation applicable to the filing of § 1983 complaints are

subject to equitable tolling during the period of time a prisoner is exhausting administrative

remedies. *Battle v. Ledford*, 912 F.3d 708, 719–20 (4th Cir. 2019).

Here, defendants maintain that plaintiff's two prior grievance evidence that he knew of the

administrative remedy procedures. Notwithstanding that knowledge, defendants assert that

plaintiff never filed a grievance concerning the incident involving Sgt. Lowery. As noted, plaintiff

has not opposed defendants' motion; however, he alleged in his unverified complaint that he filed a grievance regarding this incident but never received a response. *See* ECF No. 4 at 2. Plaintiffs unsupported and unverified assertion that he attempted to exhaust administrative remedies is insufficient to overcome the evidence-supported affirmative defense asserted by defendants. The complaint is subject to dismissal without prejudice for failure to exhaust administrative remedies. However, even if plaintiff could demonstrate exhaustion, the complaint fails on its merits.

**B.      Personal Participation**

Liability under § 1983 attaches only upon personal participation by a defendant in the constitutional violation. *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001). Plaintiff has raised no claims against Warden Allen. To the extent plaintiff sued Warden Allen simply because she is the warden of the detention center where the incident took place, he has failed to plead a proper claim.

Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's

inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). Warden Allen is entitled to dismissal from this suit.

### C.    Person Requirement

Plaintiff named Cecil County Detention Center as a defendant. ECF No. 4. The relevant text of 42 U.S.C. § 1983 provides:

> Every *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person with the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured . . .

*Id.* (emphasis supplied). The detention center is not a "person" subject to suit under 42 U.S.C. § 1983. A number of courts have held that inanimate objects such as buildings, facilities, and grounds do not act under color of state law and are not subject to suit under § 1983. *See Smith v. Montgomery Cnty. Corr. Facility*, Civ. No. PWG-13-3177, 2014 WL 4094963, at *3 (D. Md. Aug. 18, 2014) (holding that Montgomery County Correctional Facility "is an inanimate object that cannot act under color of state law and therefore is not a 'person' subject to suit under Section 1983"); *Preval v. Reno*, 57 F.Supp.2d 307, 310 (E.D. Va. 1999) (stating that "the Piedmont Regional Jail is not a 'person,' and therefore not amenable to suit under 42 U.S.C. § 1983"); *Brooks v. Pembroke City Jail*, 722 F.Supp. 1294, 1301 (E.D.N.C. 1989) (noting that "[c]laims under § 1983 are directed at 'persons' and the jail is not a person amenable to suit"). Conduct amenable to suit under 42 U.S.C. § 1983 must be conduct undertaken by a person, and Cecil County Detention Center does not qualify. The complaint against the detention center is dismissed.

10

**D.      Excessive Force Claim**

Plaintiff's claim that he was "maced" improperly by Sgt. Lowery is a claim that he was subjected to excessive force.  Because the incident at issue here occurred after plaintiff was convicted of several offenses, the Eighth Amendment standard applies to his claim.

The "Eighth Amendment's prohibition on cruel and unusual punishments imposes certain basic duties on prison officials." *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)).  Those duties include maintaining "reasonable measures to guarantee the safety of the inmates." *Id.* (quoting *Farmer*, 511 U.S. at 832).  To demonstrate a violation of his Eighth Amendment rights, a plaintiff must satisfy a two-part inquiry that includes both objective and subjective components. *See Raynor*, 817 F.3d at 127.  First, to satisfy the objective inquiry, the plaintiff "must establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury" or a substantial risk of such harm. *Danser v. Stansberry*, 772 F.3d 340, 346–47 (4th Cir. 2014); *see also Farmer*, 511 U.S. at 834.  The objective inquiry requires the Court to "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993).  To satisfy the subjective component of the test, a plaintiff must establish that the prison official involved had "a sufficiently culpable state of mind" amounting to "deliberate indifference to inmate health or safety." *Farmer*, 511 U.S. at 834.  Evidence establishing a culpable state of mind requires actual knowledge of an excessive risk to the prisoner's safety, in that the prison officials both were aware of facts from which an inference could be drawn that a substantial risk of serious harm existed and that they actually drew that inference. *Id.* at 837.

11

Whether force used by prison officials was excessive is determined by inquiring if the "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U. S. 1, 6-7 (1992). This Court must look at the need for application of force; the relationship between that need and the amount of force applied; the extent of the injury inflicted; the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials; and any efforts made to temper the severity of the response. *Whitley v. Albers*, 475 U.S. 312, 321 (1986). The absence of significant injury alone is not dispositive of a claim of excessive force. *Wilkins v. Gaddy*, 559 U.S. 34 (2010). The extent of injury incurred is one factor indicative of whether the force used was necessary in a particular situation, but if force is applied maliciously and sadistically liability is not avoided simply because the prisoner had the good fortune to escape serious harm. *Id.* at 38.

Here two important facts weigh heavily against plaintiff's claim that he was subjected to cruel and unusual punishment. First, the undisputed fact established by Warden Allen's affidavit that no prohibition existed regarding use of chemical agents on recalcitrant inmates who were housed in the Yellow housing unit. Thus, there was no disregard for a safety protocol as plaintiff would have the court believe. Second, Sgt. Lowery's use of force against inmate Davis was not excessive given the escalating danger presented by Davis's refusal to obey lawful orders. Further, Sgt. Lowery did not intentionally apply chemical agents to plaintiff; rather, he was standing too close to an ongoing situation that did not concern him. Sgt. Lowery's action was devoid of any animus toward plaintiff. For all these reasons, the claim fails.

12

## IV.    Conclusion

By separate order which follows, defendants' motion to dismiss or for summary judgment

shall be granted and judgment shall be entered in their favor.

Dated this __13__ day of ____Jan.____, 2022 .

FOR THE COURT:

James K. Bredar
Chief Judge

13